We'll hear argument first this morning in Case 11-139, United States v. Home Concrete & Supply. Mr. Stewart. Mr. Chief Justice, and may it please the Court, the disputed question in this case concerns the meaning of the phrase omits from gross income an amount properly includable therein in 26 U.S.C. 6501e1a. More specifically, the question is whether an omission from gross income occurs when a taxpayer overstates his basis in sold property and thereby understates the gain that results from the sale. In December 2010, after notice and comment rulemaking, the Treasury Department issued published regulations that interpreted section 6501e1a to apply in overstatement of basis cases. Those regulations reflect a reasonable interpretation of ambiguous statutory language, and they are accordingly entitled to deference under Chevron. Roberts. Well, but only if your reading of the Colony decision is correct, right? If we think that Colony definitively resolved the question before you, the regulation can't overturn that. If the court in Colony had interpreted the statutory language to be unambiguous or if the court in Colony had issued an authoritative interpretation that Congress had then built upon, that would be correct. But the court in Colony stated that the language was, in its words, not unambiguous. Scalia. Yes, but once we resolve an ambiguity in a statute, that's the law, and the agency cannot issue a regulation that changes the law just because going in, the language was ambiguous. Stewart. I don't think that the court in Colony purported to give a definitive definition of the phrase, omits from gross income an amount properly includable therein, wherever it appears in the United States Code. And the court in the first paragraph of its opinion in Colony said, the sole question before us is whether the taxpayer is subject to the extended assessment period under the 19 — under the Internal Revenue Code of 1939. And as the D.C. Circuit, for instance, pointed out in Intermountain, what we are interpreting now is the 1954 Code. It's true that like the 1939 Code, it includes the phrase, omits from gross income an amount properly includable therein, but it also includes adjacent provisions that bear upon the meaning of that phrase.  an amount properly includable therein, wherever it appears in the United States Code. Roberts. Well, if they used the exact same phrase, and it's a fairly detailed phrase, it's important to remember that the 1954 Code was enacted in 1954 and the Colony decision came in 1958. And so I would take your point that if Congress had enacted the same language after this Court's decision in Colony, then the adjacent statutory provisions that we're relying on would be pretty indirect means of an — of expressing an intent to change the law. But what Congress was reacting to in 1954 was not this Court's Colony decision. It was reacting to a circuit conflict and trying to resolve that conflict. Scalia. But our job is not to plumb Congress's psyche and decide what they had in mind. It's to interpret the statute. And if, as you acknowledge, it's a pretty obscure way to change the law from what we said it was, the law that's written there, that's a very obscure way to change it. I'm inclined to think that the law stays the way it was. Well, let me point to the statutory provisions that I have in mind to explain a little bit more fully why we think that the context in which the new provision or the 1954 provision appears bears on the proper interpretation of the disputed phrase. It's at page 1A of the red brief, the appendix to the Respondent's brief. And the general rule stated in subsection A is if the taxpayer omits from gross income an amount properly includable therein, which is in excess of 25 percent of the amount of gross income stated in the return, the assessment period is 6 years rather than 3 years. And it's important to recognize that for purposes of the Internal Revenue Code generally, the term gross income is defined to include gains derived from dealings in property. And in that sense, it might be the case that it's not the case that it's not the case in this statute. You made the same argument under the Colony Statute, it lost. So you can't go back to that argument because it's already been rejected. So what goes from that? Well, if you look at subparagraph I, Roman I, or Roman I, after the general rule, it says in the case of a trade or business, the term gross income means the total of the amounts received or accrued from the sale of goods or services. If such amounts are required to be shown on the return prior to diminution by the cost of such sales. Sotomayor, my problem with your argument, as I read it in the brief, it's a bit convoluted, as Justice Scalia observed, but if Congress intended to change Colony, it wouldn't just have created this subdivision I, it would have changed the main statement. So why don't we read this as simply saying we accept whatever Colony said, and the only thing we're creating exceptions around are the following, the exception argument. As I say, I would agree that if Congress had passed this statute after the Court's decision in Colony, that this would have been a fairly oblique way to reflect an intent to change what the Court had done. But Congress was acting in 1954, before the Court's decision in Colony, and it was reacting to a circuit conflict. And I think it's just as fair to say that if this language would have one meaning if the very same language were adopted after our decision in Colony, and a different meaning if it were adopted as it was before our decision. That's a very strange approach to the meaning of a statute, it seems to me. It may be strange, but I think in a sense it's the Respondents who are striving for strangeness in the following way. Kennedy, but you're saying, and I'm just trying to supplement Justice Scalia's question so you can continue to answer it. You're saying that the split is somehow more obscure or more imprecise in its formulation than what Colony did. You're saying that, oh, if Congress knew about Colony, they would have done it differently. But with the split, this was close enough for government work. That seems to be your argument. And I don't know. No, I guess there are two things I'm saying. The first thing I'm saying is, in order to construe the statute, we need to not put ourselves in, attempt to put ourselves in the minds of Congress, but at least be aware of the state of the world at the time that Congress acted. And in 1954, when Congress acted, there was the circuit split. And if Congress had wanted to endorse the Colony rule going forward and apply it to trades to non-trade and business taxpayers as well as trades and businesses, the most natural thing would have been to change the word amount in the main rule to item, to make clear that the main rule would apply only when an item of gross receipts had been left off the return altogether. It also would have been natural, if Congress had wanted that rule to apply going forward, to change the term gross income in the main rule to say gross receipts, because gross income. Kennedy, I still don't understand why the world was different after Colony addressed the split than before Colony addressed the split. The issue is still the same. I guess the way I would respond to your question, Justice Kennedy, is to say, if you look at the statute in its current form, both the text of the main rule and the adjacent provisions that contextually bear on its meaning, then I think ours is by far the better interpretation. And really what Respondent does is to say that Colony is the law, and it's the law,  and that language meant a certain thing, and the issue is whether this is, this change is enough to change the meaning of the statute. And I'm dubious about that. I guess my main point is we think our reading of the text is better, and what Respondents have going for them is the argument that whether or not this is the way you would otherwise construe the statute, once Colony has said what the statute meant, the court is bound by it. And our point is that methodology doesn't really work with this provision, because the court in Colony's case. Kagan Mr. Stewart, don't you have two arguments? One is that the statute changed, but the other is that even the statute remained the same, even if the statute remained the same, Colony itself was a decision that found ambiguity in the statute. So you have the power under Brand X to go back to that statute and reinterpret it, if you will. Stewart We do have the power under Brand X, but we don't think that the court needs to reach that question. And when the court in Colony said that the court thinks it has to reach that question because it agrees more with Justice Scalia than with you as to whether this statute stays the same, then you have an independent Brand X argument, don't you?  Yes, we do. Roberts Well, about that argument, you rely very heavily on the fact that Justice Harlan used the term ambiguous, right? Stewart Yes. Roberts But he was writing very much in a pre-Chevron world. He was certainly not unnoticed that that was a term of art or would become a term of art. And, of course, I didn't know him, but my sense is he was very gracious and polite. And you can see him saying, well, that's a good argument, but, see, he's not the sort of person who would say this is it, this is it. I don't think you necessarily can take the use of the word unambiguous in his opinion to mean what it does today. Ginsburg But he did say that something was unambiguous, and that was the little i that was added. And he also said he wasn't taking any position on the 54 code, isn't that so? Stewart That's correct. And the Court said that both at the end of its opinion and it also said at the beginning the only question before us is whether the extended assessment period applies under the 39. Roberts Is there a case where we applied Chevron deference to a pre-Chevron opinion? In other words, saying, well, the Court looked at that, but the Court said it was ambiguous, and so we apply Chevron. Stewart I'm not aware of any case. Obviously, Brand X is a recent decision of this Court. And I would agree with you that it's terrible to kind of put a Chevron overlay on decisions that were issued before Chevron. And without Chevron, I mean, even apply it, I would have thought the point of Brand X is you look at the language of the statute and you look at what Congress intended and where they intended the agency to have power to interpret, you follow the agency. And you could do that after the event if the basis for your decision is that it isn't clear. But that isn't Harlan's opinion at all. He goes and looks at what Congress meant, and what they meant is treat basis like you treat a deduction. And he gathers that from the legislative history. And so I don't see the basis for saying now the agency still has power. Now, forget that one. I mean, that's one point you might want to address, but I may be too unique in that, in which case it's not worth your time. Breyer Let me give two responses to that, Justice Breyer. I think in effect what Justice Harlan did for the Court in Colony was to construe the term, the reference to an amount of gross income as though it meant item of gross receipts. That was the practical effect of the Court's decision. And I think two of the adjacent provisions of the current code make clear that that's not a statement. Breyer No, I didn't think that was the basis. I thought the basis is that there are two kinds of things. One is you just don't put in some big category of stuff in your return and the agency can never figure that one out. And the other is where you don't state your deductions correctly. And now, the cost of goods sold and the basis are difficult cases because of the way the code defined gross income. It defines it in terms of gain. But Harlan says they are like deductions for purposes of this statute. That's how I read it. But I have a different question. You can pursue this one if you want. What's really bothering me about this case, and I can't quite figure out the answer to this, is it seems to me when they filed that tax return in April of 2000, it was a terrible loophole, but these lawyers have the job of creating loopholes or at least trying to take advantage of them. Okay? And the IRS had told them this was okay. Indeed, they had informal advice to that effect. Now, there's a — you don't put the date of the year 2000 reg, and I don't know if you're both talking about the same thing. I was really surprised there was no date there. Then what happens is after you lose in every circuit, not you personally, they lose in every circuit, and then in the year 2009, they say, though we lost and though we told everybody this is okay at the time they filed the return, now we're going to pass a new reg and we're going to penalize them taking all back this money 9 years later. That seems to me pretty unfair. So I'd like to know just that answer. Well, at the time that the 2009 regulation was promulgated, first in temporary form, we had lost cases in two courts of appeals. One was Bakersfield in the Ninth Circuit, but the court of appeals in that case said that because the statutory language was ambiguous, the agency might be able still to promulgate a regulation that would get Chevron deference. And what was the date of that at Bakersfield? That was in, I believe, 2008 was the Ninth Circuit decision in Bakersfield. At any rate, it was before the issuance of the regulation in temporary form. A couple of months before the regulation was promulgated, we had lost Salmon Ranch in the Federal Circuit, but that was by a 2-to-1 vote. At that time, we had won this issue in four trial courts. But, Mr. Stewart, prior to this latest round of litigation, had the IRS ever said, ever given any indication that it viewed colony as not controlling any longer? Stewart. Yes. I think probably the best indication of our position in the intervening years, and we agree that there's a surprising dearth of law, was the Fifth Circuit litigation in Finney, P-H-I-N-N-E-Y, which was decided in 1968. Finney involved a situation in which the taxpayer accurately reported the amount of gross receipts, approximately $375,000, but misstated the nature of the receipts as proceeds of a stock sale rather than of an installment sale. And the reason that that misstatement of the nature of the receipt made a difference was that it potentially affected the taxpayer's entitlement to take a stepped-up basis. And so the court of appeals in Finney said that was subject to the extended assessment period, that the misstatement of the nature of the appeal. And as a result of this case, the IRS suggested in any kind of guidance or rulings or anything else that it viewed Colony as an outdated decision. Because, you know, I'm a taxpayer and I'm reading Colony, and I'm thinking the language of the statute is still the same. Why wouldn't Colony control? Well, I think one reason you might think that is that if you were reading the opinion was not oblivious to the fact that the 1954 code had been enacted in the meantime, and the court went out of its way to say we are discussing only the 1939 code and we are not pronouncing on the meaning of the 1954 code, other than to note that our conclusion in this case is consistent with the unambiguous language of new 6501E1A. And as the D.C. Circuit explained in Intermountain, that is best read as a reference to subparagraph I, which says that for a trade or business taxpayer, gross income will mean gross receipts without an offset for the cost of acquiring goods and services. So I think as a taxpayer, you would at least be on notice that there was uncertainty as to the proper meaning of the code. Judge Boudin had written for the First Circuit in a case called C.C. and F.W. Operations in 2001 that it was at least doubtful whether the main holding of Colony carried over to the new, the 1954 code. That was certainly dictum, but it also flagged the fact that this was a subject of uncertainty. And remember, the provision at issue here doesn't bear on the legality of the taxpayer's substantive returns. The only question is whether the IRS has 3 years or 6 years to make an extended assessment. So as of 2003, when 3 years from the date of the return had run for these taxpayers, I think what was out there gave them notice that there was at least uncertainty whether Colony applied. Breyer, in your brief, on page 4, in 2000, the IRS issued a notice informing taxpayers that son-of-boss transactions were invalid under the tax law, and site, without a date. So I was sort of curious whether that particular site came before or after they filed their return. I don't know whether it's true. And they say that, and I don't know, in July 2000, 3 months after they were filed, the Commissioner reiterated his view it has long been held that the extended statute of limitations, da, da, da, is limited to when specific receipts or accruals are left out of gross income, which is basically the Colony statement. Are you talking about the same thing? Breyer, no, those were two different documents. Breyer, okay, so they're two different documents. So in July, they're telling the tax bar, this is okay, and what you say is this document here, which you refer to without a date, told them it wasn't okay. I'd be rather curious if you could sort that out. Well, the 2000 notice that the Respondents have cited, I think the most important point to make about it is that it was the view of a single, of the district council for a single district within the IRS. I know there are many ways of downplaying that, but I'm just curious as to what happened. What about the one you cited? When was that? I don't know the exact date in 2000, but it has long been established that transactions lacking economic substance and transactions motivated purely for tax avoidance purposes may be disregarded from by the IRS. That was a preexisting proposition. When we issued the notice with respect to son-of-boss transactions in particular, that was simply the IRS's way of informing taxpayers that we regard this particular tax avoidance mechanism as encompassed by the general principle that transactions lacking economic substance. Well, yes, that's the general principle, but the point you made just a few moments ago is, I think, is responsive to that, which is we're not talking about the merits. We're talking about a statute of limitations. The whole point of a statute of limitations is some things that are bad are gone. You can't go back to them. That's correct. And that's the proposition that the Respondents are citing the different 2000 document for. They are citing it as though it were a definitive statement of agency position as to the operation of the assessment period. It was not that. It was a document issued by a single district council. And in a sense, the reference to Colony as continuing to, as though it continued to govern the 1954 Code was dictum, because the district council, even in that document, stated that it would not be inappropriate. At what level of the IRS bureaucracy can you feel comfortable that the advice you're getting is correct? A single district council, you go to there and say, what do you think, and it tells you, and you say, well, that's fine, but I know you don't count, so I want to talk to your boss and boss. No. This was not advice to the taxpayer. That document was a memorandum from the district council to another IRS official. The other IRS official was seeking guidance with regard to the question of whether we needed to get within the 3-year assessment period or whether it was appropriate to rely on the 6-year assessment period. And although the district council cited Colony in a way that it suggested that it continued to control the operation of the 1954 Code, the district council stated on the facts of this case it would not be inappropriate to rely on that. Roberts. Roberts. So what happened here is that the taxpayer came to the same conclusion as a district council of the IRS. That's correct, but not — didn't come to the same conclusion as the IRS did in litigating the case in Finney, didn't come to the same conclusion as the IRS did in the case  So what about the July? That's the July. What about this other undated one? Now, I notice what you say about it. You said that it described arrangements that unlawfully purport to give them. If I read that piece of paper, which I might, and you've probably read it because you cited it, will I come away with the impression, uh-oh, these loophole arrangements son of boss, which previously seemed to be okay, are now not okay? Is that the impression I'll have? First, I would say that that notice would not, say, tell you anything relevant to the computation of the assessment period. That's what I suspect. Then look at the unfairness of this. I'm not saying there aren't worse unfairnesses in the world, but nonetheless, people spent a lot of money. The whole bar has gone to an enormous effort. Everything up through 2000 seems to say you can do this. You have a case on point in the Supreme Court, and then 9 years later, after continuous litigation, the IRS promulgates a regulation which tries to reach back and capture people who filed their return 9 years before. Again, I'm not quite sure what you mean by saying, would seem to say that you could do this. I don't think that there were any affirmative IRS statements that could lead people to believe that the son of boss boss mechanism was okay. Ginsburg. Can you clarify, Mr. Tewitt, two things that Justice Breyer brought up? One, he said that the IRS had given people advice that son of boss was okay, it would work, this tax shelter, this tax scheme would work. And then he said, he suggested that the basis is like deductions, and you agree that overstatement of deductions don't get you the longest statute of limitation. So why should an inflated basis get you to 6 years when inflated deductions don't? That's one question. And the other question is, is it so that agents told people that son of boss would work? It's okay. It wasn't until 2000 that the IRS issued a specific document that said, as a matter of agency policy, they're not okay. But again, that document was just a kind of case-specific application of the more general proposition that transactions lacking economic substance can be disregarded. With respect to why the overstatement of basis is treated differently from the overstated deduction, that follows inexorably from the language of the Code. That is, Congress defined the conduct that would trigger the general rule as an omission from gross income. And because of the way that gross income is defined, an overstatement of basis can lead to an understatement of gain, which in turn is taken into account in computing gross income. A deduction may ultimately affect taxable income, but it doesn't affect gross income. And so there would be no way of reading the statute to encompass that. Now, as to why Congress would have done this, I think a clue is furnished by subparagraph Roman 2, which is at the bottom of page 1A. And it says, In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return, if such amount is disclosed in the return or in a statement attached to the return in a matter adequate to apprise the Secretary of the nature and amount of such item. And so that provides a safe harbor that says, even if you fall within the general rule, even if you understated your gross income by more than 25 percent, if at some point in the return you gave the IRS adequate information to notice that the misstatement had taken place, you will be off the hook for the 6-year assessment period. And I think that is highly relevant in responding to the policy concern that Justice Harlan identified in Colony. That is, Justice Harlan said the reason we think that Congress intended to restrict the statute to situations where an item is left off the return altogether is that those would be the most difficult for the IRS to catch, the IRS would be placed at a special disadvantage. Here in subparagraph 2, Congress has accomplished the same intent but through a different mechanism. That is, it's made the general rule sweep more broadly, but given taxpayers an out where the disclosures are adequate. If I could reserve the balance of my time. Kennedy Just on that point, and we'll find out in a minute, is the Respondent going to say, well, it's always implicit that you have a basis, everybody knows you have a basis. So that's necessarily what you're telling the government. Stewart I don't think he will say — I don't want to speculate too much on what he will say, but I think his position is an overstatement of basis could never trigger the assessment period because the item of gross receipts would have been adequately disclosed. Roberts Thank you, counsel. Mr. Garre, is it implicit that you always have a basis? Garre Your Honor, our position is the one that the Court reached in Colony, which is that an overstatement of basis is not an omission from gross income. What the Court held in Colony was that an omission from gross income is where you leave out a specific taxable item or receipt. We think the Court of Appeals got it right when it concluded that the statute limitations on the statute — on the tax assessments at issue expired in 2003 and rejected the IRS's extraordinary efforts to avoid that result by discombobulating this Court's decision in Colony and by seeking to retroactively reopen and extend the statute of limitations. What the government relies on principally is the addition of subparagraph i in the code, and that was added in 1954 before the Court's decision in 1958. And I'd like to make a few points about subparagraph i because I think it's the crux of the government's position. The first is just the anomaly of their argument that by adding this subparagraph — and it's on page 1A of the addendum to the red brief — which explicates the definition of gross income in one specific context, the sale of the cost of goods or services by a trade or business, Congress meant to change the general rule — and that's what it called it, the general rule in subsection A. Kagan Well, why do you think they added that paragraph? Because it seems clear that there was a circuit split at the time about exactly this question and that this paragraph was a response to that circuit split. So what else could Congress have meant by it? Phillips Well, Your Honor, I think that's probably right. It thought it was agreeing with the taxpayer side of the circuit split. There's legislative history indicating that it also thought it was addressing the computational rule of how to get to gross income, which factors into the 25 percent trigger. I think what maybe is most important is that this Court in Colony looked at the 1954 amendments at the suggestion of the government and concluded that its decision was consistent with the 1954 amendments. That's in the last line of the decision. We're most of the— Ginsburg I can't refer to the — Holland said two things. He said it's ambiguous, therefore I'm going to look at the legislative history to find out what the predecessor section means. And then he says, I'm not going to speculate on what this new thing means, but I do want to point out that the result we reach in Colony is in harmony with the unambiguous language of 6501, et cetera. The only unambiguous language that he could be referring to is in I, because he's just — he had said the earlier language was ambiguous. Well, I don't think so, Your Honor. First of all, you're right. He referred to the whole 6501e1a, which includes both subsections. It's not clear that he was identifying subparagraph I. He could have well been referring to subparagraph II along the lines of what my friend just spelled out, because much of the Colony decision was based on addressing the situation where the IRS is at a special disadvantage because something's been left out entirely. And that really kind of gets to the heart of subparagraph II. But the anomaly of the government's construction here today is that Colony would come out differently, because Colony doesn't involve a taxpayer involved in the sale of goods or services. It involved a taxpayer in the sale of real property. So even though this Court in Colony said the real estate developer in the business of buying and selling property, so I'm not sure that I buy your argument that it can't be goods and services, because that was the services of this particular company. Your Honor, the sale of real property, whether in parcels or otherwise, has always been treated differently than the sale of costs of goods or services, which really is a term of art. And if you go back at Colony, you can see that the Court referred to basis, referred to property, and that's precisely the way that the parties did in their brief. The Solicitor General in its own brief framed the question presented as overstatement of basis in the sale of property. That's the situation that we have here today. The subparagraph I that referring to is addressed to the specific situation of a trader business involved in the sale of costs of goods or services, which is different. Kennedy, I was going to ask in conjunction with Justice Kagan's section, were the precolony cases that involved splits, did most of those or any of those relate to sales of goods and services, or were they all real estate sales? Your Honor, the Uptegrove case did, the Third Circuit case, but they involved the fact that they involved both the sale of property and the sale of goods and services. And at that time, no one was drawing this bright-line distinction. Well, but the Congress drew it, as I think is implicit in Justice Kagan's question, when it talks just about goods and services. It did do that. There was one reason for Congress to address that specific situation, and that there was a regulation that had defined gross income differently. It's appended at the end of our brief, and it was discussed in Uptegrove. So there was a reason to single that out. But I think more of the reason is with goods and services, there's always FIFO and LIFO. I mean, there's taxpayers who sell goods have inventory cushions, and so the IRS is very, very well aware that that kind of judgment is involved in all these statements. It's not quite the same with basis. Well, Your Honor, I think it's the opposite, if I understand your question, which is that taxpayers typically put more information, which is going to put the IRS on notice when you're dealing with basis in the sale of property, as opposed to the cost of goods and services, which involve many transactions and you're dealing with them in the aggregate. When you're dealing with the sale of property, as in Colony and here, you're dealing with specific disclosures as to the basis. Here, if you look on page 151 of the J.A., it lays out the adjustment and the basis, and the same was true in Colony. And so to the extent that there's a distinction there, I think it cuts in favor of the taxpayer. The problem for the government is all of the amendments in 1954 were pro-taxpayer amendments as relevant here, and yet the government's conclusion is that by adding this subsection addressing a specific situation, it meant to take away the general rule in a way that hurt taxpayers. It's inconsistent with what this Court said in Colony, because the Court said that  Ginsburg. But why would they be redundant? I mean, if the statute without little i meant what you said it meant, then there would be no occasion to put this in, because omission from gross income would refer to items of income, period. So what work does i do if it just, if the main rule, the general rule is as you say it is? Your Honor, everyone agrees it's not redundant, even the government, because what it does is at a minimum it has a computational effect of affecting the 25 percent trigger. The amount to get to the trigger has to be 20. But you agree that that's not why Congress passed that provision? Well, it's not clear, Justice Kagan. The Federal Circuit in the Salmon Ranch case cited legislative history that suggested it was trying to achieve just that result. But I think the broader point I would make is it's not at all uncommon for Congress to act to provide an answer to a specific situation that had come up by explicating it. And yet one doesn't conclude that in doing that it's intended to overstate, override the entire general rule that's stated, particularly where it doesn't touch the language that's subject to the general rule. Congress didn't in any way touch the phrase interpreted in Colony, omission from gross income. And the anomaly gets even greater if you look at Congress's actions after Colony. In 1965, Congress amended the heading. Now, granted, it's only a heading, but it amended it, the heading to the subsection to mean substantial omission of items, which is perfectly consistent with Colony's interpretation, directly contrary to the government's interpretation. In 1982, Congress reenacted the same language, omits from gross income, found in the U.S.C. 6229, which is the provision for partnerships, and yet it omitted the subparagraph I that the government relies upon as a transformative provision narrowing the general rule. And so why on earth would Congress omit that subparagraph if it did the transformative work that the government suggests? The government doesn't have a response except to say that they have to be interpreted the same way, which makes no sense given the emphasis it's placing on subparagraph I. I think the answer is subparagraph I just doesn't have and was never intended to have the transformative effect that the government suggests. Whatever we can talk about what the Court meant in Colony, but I do think that it's critically important that Colony is entitled to full stare decisis effect. In fact, it's stare decisis coupled with congressional reenactment. The government describes the world after Colony, but the fact is if you go back and look, no one thought that Colony was just a ship passing the night that had only retrospective significance. Everybody, including the IRS, appreciated that Colony was a landmark decision. Kagan Well, Mr. Garreau, where do you find evidence of that? Because you cite some cases in your brief that end up not really supporting your position. And as far as I can see, there's only one case after Colony that deals with the question of whether Colony continues to govern after the 1954 amendments. And that case, which is Finney, seems to cut in the opposite direction. So am I missing something? Are there cases that favor you, that say that, yes, Colony continued to control? Garreau I think my response would be first as to Finney. The Fifth Circuit has clarified that the government's construction of Finney is just wrong. Finney was consistent with the Colony rule. It dealt with a particular application of it.  Well, whatever the Fifth Circuit said about Finney, when I read Finney, it seems to me to cut in the government's direction, if not to be entirely on all fours. But I ask, are there any other cases that you have that suggest that the courts did think that Colony was continuing to be the governing rule? Garreau If I can make one point on Finney, and then I'll address the other cases, I would ask you to look at the Solicitor General's opposition brief in Finney, which recognized that Colony was the governing principle. One would think that the government thought that Colony was just a shot in time, had no ongoing significance. They would have said that in the opposition brief in Finney. The Solicitor General accepted Colony as the governing rule, as everyone did. As to the cases, I think it's fair to say that, no, we can't point to a case in the 1950s, 60s, or 70s where they specifically confronted the question before the Court today. But what I can say is look at the cases that we cite in our brief, and all of those cases discuss this Court's opinion in Colony as if it continues to have a lasting effect on the interpretation of the omits from gross income. And yet, in the government's, the IRS's own internal documents, we cite two, 1976 and 2000, where the IRS internally is treating Colony as a landmark decision which controls on a current going forward basis. Kagan That was what I was thinking, Mr. Garreau, and tell me what you think the consequence of this would be. Is that if I were a tax lawyer and somebody came to me and said, is Colony still the rule, I would have said, well, I can't tell you 100 percent. I think you're good 70 to 80 percent. You know, it's the same language, and there's Colony out there, and nothing, the IRS hasn't said that Colony doesn't control, but I can't, so I'm giving you 70 percent. Do you win if that's the state of the world as I see it? Garreau Well, I don't know how you would put a percentage on, in effect, whether Colony was a step one case or not. I mean, look at it. Kagan Well, in terms of what a taxpayer thinks, whether Colony continues to govern. Garreau I think so. I mean, I think, you know, the IRS's actions here really put taxpayers in an extraordinary situation. I mean, they're taking a decision of this Court that says, an overstatement of basis, no, that's not an omission of gross income. They're relying on the 1954 amendments to get around that. Look at the Colony decision. The Colony decision says the 1954 amendments, nope, this decision is perfectly consistent with those. And here comes the government. Ginsburg But it also said before that, Mr. Garreau, and without doing more than noting the speculative debate between the parties as to whether Congress manifested an intention to clarify or change the 1939 Code. So in not taking a position on whether the new section changes the Code and the part that is in Harmony, I can't see how that could be read to mean anything other than the I, which is unambiguous and certainly in Harmony with the resulting Colony. Garreau Justice Ginsburg, the government in Colony argued that the 1950 war amendments compelled its interpretation, which was the one that the Court rejected. If this Court, this Court must have considered that argument in reaching the opposite conclusion. I think you're right that it's fair to describe that language as dictum, but this Court has many times said that even if something is dictum, if it explicates the Court's holding, the lower courts and this Court would give it a great weight. Ginsburg But as I read it, it isn't saying in Colony controls. It's saying we're not going to take a position on what the 1954 Code does, whether it clarifies or changes. Garreau I think the prefatory language there, I think you're right, that's a fair characterization. But ultimately what the Court said was its holding was in Harmony with the new statute. And you can't reach that conclusion if you agree with the government's interpretation in the new statute. Ginsburg But it's an unambiguous language, and he can't mean the general rule, because he's already said that is ambiguous. He's got to mean the new provision, which is certainly unambiguous. Garreau I don't think it has to be I, Your Honor. I think it could be subsection 2i. We don't know which one he was referring to. And the reason why it could be subsection 2i is because a great deal of the Court's I would like to address the rationale in Colony. My friend has referred to Roberts If I could just interrupt you before you do so, to follow up on Justice Kagan's question. Under our current regime, can you ever give more than a 70 percent chance? Because you have, in the absence of a definitive Supreme Court ruling, the IRS can reach a different result, and it can do that retroactively. So, I mean, you don't disagree with that, right? I mean, if we determine that Colony was ambiguous, the IRS can change the rule in Colony, and it can apply that ruling, new rule, retroactively. That's what our cases say, right? Garreau Well, we do disagree with it. I mean, I certainly accept the Brandeis part of that. What we disagree with is that, A, the IRS has the authority to retroactively apply an interpretation of a statute, which gets to the meaning of 7805b1, and, B, whether or not the regulation in this case on its face applies it retroactively. But I accept that. Sotomayor They can't change the interpretation of a statute, but they are the agency with expertise to define a term within the statute. Why don't they have the expertise to define either what the words gross income mean or don't mean? Garreau Well, they don't have any leeway to overturn this Court's decision if that decision specifically addressed the question. And that's the language of Chevron. And as it turns out, it's not. Scalia According to Brandeis, if it specifically addressed the question and said that there was no ambiguity. But according to Brandeis, if there's ambiguity, despite a holding of this Court, the agency can effectively overrule the holding by a regulation, right? Isn't that what Brandeis says? Garreau Brandeis says that it is. Scalia So the only question here is, as the Chief Justice put it, whether indeed a colony meant by ambiguous, ambiguous. It depends on what the meaning of ambiguous is, right? Garreau I don't think so for this reason. Because the colony, at the beginning of the Court's decision, Justice Harlan, in a gracious way, as the Chief suggested, pointed out that there could be some ambiguity in the text. But then he went on to apply the traditional tools of statutory construction. Alito I can hardly think of a statutory interpretation question that we've gotten that doesn't involve some degree of ambiguity, if we're honest about it. We take a case where there's a conflict in the courts of appeals. And so there was at least enough ambiguity in those cases for one or more courts of appeals to come to an interpretation that's contrary to the one that we ultimately reach. So what degree of ambiguity is Brandeis referring to? Garreau Well, I would think that Brandeis refers back to Chevron and looks to the first step of Chevron. What Brandeis is looking to is whether or not it's really a step one or step two case. And on step one, Chevron looks to whether Congress has addressed the specific question presented. And if you look at the Court's decision in Colony, what Justice Harlan said was Congress was addressing itself to the specific situation where a taxpayer actually omitted some income receipt or accrual in his computation of gross income and not more. Kagan That was the specific situation, but then the question was how clearly did Congress speak to that specific situation. And in order to get his result, Justice Harlan says first that the statute is — that the statutory text is ambiguous, goes to a bunch of legislative history, and none of that legislative history actually speaks to the exact question before the Court, only by implication. So if you look at the whole of the Colony opinion, it sure seems as though there's a lot of extrapolation going on and essentially a lot of ambiguity. Well, I would disagree with that, respectfully, Your Honor. I think the holding of the Court, and again, it's entitled to stare decisis effect, even if this Court might approach it differently today under different modes of statutory construction or otherwise. The holding of the Court was that Congress addressed the specific situation of whether an overstatement of basis was an omission from gross income, and the Court said no. Kagan Well, in the end, there has to be a resolution. But the question is, what does it look like before you get to that resolution? And Justice Harlan is doing a lot of tap dancing there, you know, going to this Senate report, going to that House report, going to this colloquy, before he can come up with an answer. He was employing the traditional tools of statutory construction, not just legislative history. He talked about the structure and purpose and the patent taxing congruities created by the government's position that an overstatement. But he did say he was looking to let it — he said the text isn't clear. Therefore, I look to the legislative history. And that's a tool of statutory construction. Breyer, I agree with you on that. And I agree with Justice Scalia, actually. There are many different kinds of ambiguity, and the question is, is this of a kind where the agency later would come and use its expertise? And you're saying here it was up to the Congress and looking at what they had in mind. All right. Maybe that's the base, best ground. But suppose it turns out a majority think you're not right on that. Okay. Now, here's my question, assuming you're wrong on that, which I'm not sure you are, but assuming you're wrong. Now we get to this regulation. Now, here is my problem. One, I have no doubt at some level it seems rather unfair, but that instinct is not enough. The question is what? What's the law? A, you can say the word open doesn't include this case. But we run into the problem that an agency has great authority to construe its own regulation. B, you could say that, well, there is this statute out there that says don't apply it, and there are two roots there. One is something to do with language, which I think you can think of, which seems to cut very much against you if read naturally, but you can strain it to read it in your favor. And the other has to do with a parenthetical where, once again, although they left it out of their brief and they put in ellipses, I can see why they left it out, because when you read it, it's again ambiguous. We run into the same problem. Then you could say, well, they're not supposed to do these things retroactively, either on common law, administrative law grounds or something like that. They shouldn't do it. It's unfair. And they'll say, but you see, it wasn't that unfair. A child of two would have known this was a loophole. That's how they would have characterized it. And the IRS never said anything, except for one district director in a different district, that really encouraged or underwrote this kind of thing. So it's not nearly as unfair as you think. If you live by loopholes, you'll die by regulation. You know, something like that. So looking at those four possible grounds, and I can't think of a fifth, you take your choice, which is the strongest, and how do you apply to the objection? Well, I think you would first look at the language of the regulation and see whether or not, by its terms, it applies retroactively. This Court has made clear, it made clear in the Bowen case, that it's not retroactively unless there's a clear – not retroactive unless there's a clear statement of retroactivity. And our position is, whatever else is true, what the effective date provision says and the preamble says, it's just unclear about whether it's retroactive or not. Scalia. I've never thought that a revision of a statute of limitation was retroactive legislation, just as I've never thought that a provision altering rules of evidence for a crime, even for crimes that were committed before that alteration, is retroactive legislation. I think, you know, the crucial date is the date at least it's not retroactive – well, you can extend the statute of limitations. I think it's retroactive in the worst way for this reason. It at minimum extinguishes an affirmative defense, the statute of limitations. This Court recognized that in the Hughes Aircraft case. Scalia. So say it's unfair, but I'm not sure that the rule against – presumption against retroactivity technically applies. Well, again, I mean, I think if you look at Landgraf and the cases talking about what is retroactive, this regulation here, if it is applied retroactively, has the consequence this Court points to as the worst kind of retroactivity, which is extinguishing a valid defense litigation, imposing new consequences for past actions. Hughes Aircraft recognizes that, as do the many courts of appeals that we've cited in our briefs. Sotomayor, because you're saying that this is a new interpretation, but the IRS is taking the position that the meaning hasn't changed, that it's just clarifying some ambiguity that the courts have had, not that it's had. And with all due respect, the law in 2003, when the statute of limitations expired, was colony. Even if the agency had leeway to reinterpret it, it's changing the law. And the reason why it's doing that is it's doing it retrospectively. If you look at cases like Brandex, the theory is you have one interpretation and then the agency going forward can have another one. In Brandex, the agency sought to apply its new interpretation prospectively. Here it's doing retrospectively, and when it does that, it changes the law. Maybe the concrete example of that is there's too many presumptions in your answer. The first is that colony controlled. When colony itself says it's not interpreting the new statute, whatever the footnote meant. My point on that was not that colony controlled is a step one matter. It's that even if the government is right that colony just said this is one permissible reading, it was the law as the the permissible reading and the law until the government changed it. And the government didn't change it, try to change it, until 2009. The statute of limitations in this case expired in 2003. And so if the government can adopt a new interpretation going forward, the question is can it apply that interpretation retrospectively during the time frame in this case. And our position on that is that they certainly haven't done so unambiguously. And that, as this Court said in St. Cyr, ambiguity means unambiguous prospectivity. And the Court also rejected that. Kagan. Do you understand the preamble as part of the regulation? Because if I look at the preamble, the preamble seems pretty clear to me. It seems to me that your view that the government did not do this clearly enough must rest on looking at the regulation without the preamble. No, no. I mean, the Court could. I mean, certainly we think you would go first to the regulation and it says was open. The preamble says, quote, this is not retroactive. It says it does not apply to open tax. It only applies to open tax years and not to reopen closed tax years. That's on 75 Federal Registers 78, 898. The government, the way that the government gets there is to say that, well, even though we've passed the regulation long after the statute of limitations expired, because this case is pending, we can apply the new interpretation in determining whether the period closed long before we passed this regulation. At a minimum, that's a highly strained, if not convoluted way to get around retroactivity. The way that the regulation's effective date and the preamble speaks about whether this is retroactive or not is really kind of nonsensical. And I think at a minimum the taxpayer ought to get the benefit of that, and this Court should say that if the government really wants to do, take the extraordinary step that is taken here to retroactively reopen the statute of limitations, it ought to do so in clear terms and not the convoluted way it's done here. We also think that the IRS just lacked the authority to legislate, to pass a new interpretation on a statute retroactively. That gets to the meaning of 7805, and whether, which says regulations relating to a statutory provision enacted after the 1906 legislation, which purported to strip the IRS of authority to act retroactively, whether the enacted after clause modifies regulation or statute. And we think in context it must modify regulation because there's two types of IRS regulations, regulations related to statutes and regulations relating to IRS internal practices. And what Converse said is internal practices, sure, you can operate retroactively when appropriate. With respect to new interpretations of statutes, not retroactive. That was landmark legislation as part of the Taxpayer Bill of Rights. Kagan. I take your point about the purpose, but you would have to ignore every rule of grammar that there is in order to read it your way, wouldn't you? Not if you read regulations which relate to statutory provisions as one thing. Regulations which relate to statutory provisions as opposed to regulations which relate to IRS provisions. And if you look at the legislative history, it's clear Congress was thinking about that distinction. If you do read that as one unit, then the enacted on or after obviously modifies that. I think you have to look at it in context in light of the purpose of it to get to that conclusion. But courts have adopted that conclusion. The American Council, American College of Tax Counsel lays out those cases. We think Judge Wilkinson got it right when he referred to the IRS's position in this case as an inversion of the universe and concluded that accepting IRS's position would stretch accepted administrative deference principles beyond their logical and constitutional limit. The IRS has the tools at its disposal to identify tax deficiency and to take appropriate action timely. Congress acted in 2004 to respond to the precise situation precipitating this case with Son of Boss transactions. It amended 6501 not by changing the meaning of what's in the mission from gross income, but by adopting a new provision which requires taxpayers involved in listed transactions like Son of Boss to report many additional things and saying that the statute of limitations did not apply at all if they didn't make those reporting requirements. So going forward, the only impact of the Court's decision in this case is going to apply to everyday regular taxpayers who simply erroneously misstate or overstate the basis in the sale of a home or other assets. There's no reason to take the extraordinary steps that the IRS takes, asks you to take in this case, to reach that conclusion. We would ask the Court to affirm the judgment of the court of appeals, to reject the IRS's aggressive position on administrative power, and put an end to a case that the taxpayer should have never had to file in the first place. Roberts. Thank you, counsel. Mr. Stewart, you have 3 minutes remaining. Stewart. Thank you, Mr. Chief Justice. I'd like to make three quick points. First, Mr. Garre refers to the amended heading of section — subsection 6501e, which now states substantial omission of items. But I think the heading simply points up the fact that some provisions within subsection E refer to amounts and some to items. Subsection E2, which deals with estate and gift taxes, refers to omission of items. And the legislative history makes clear that Congress chose that term precisely to make clear that the understate — or the overstatement or understatement of an item that was reported will not give rise to the extended period. The second thing is that at bottom, Respondents argue that the phrase amount of gross income should be construed to mean height of gross receipts. And they don't offer any real textual argument as to why that would be a sound reading. Really, they rely exclusively on Colony. But the court in Colony said at the beginning of its opinion that it was pronouncing only on the 1939 code. It said at the end of its opinion that it was not generally trying to construe the 1954 code. And it stated that the relevant — the most relevant language was not unambiguous. And I think the recognition of ambiguity is relevant in part because it sets up our Brandex argument, but it's also relevant because saying that a particular snippet of language is ambiguous is to recognize that its meaning may vary depending on context and the occasion. Roberts, I know you've got your third point, and I want to let you get it out, but you mentioned Brandex. Have we ever applied Brandex to one of our decisions? Have we ever said an agency by regulation can alter and change a Supreme Court decision? No. I mean, Brandex was the first case that announced the Brandex principle, and the Court has not applied it since. Justice Stevens — But that was applying it to a court of appeals decision. That was applying it to a court of appeals decision. We've never said an agency can change what we've said the law means. No. Justice Stevens wrote a separate opinion in Brandex suggesting that it might not apply to decisions of this Court, but the Court as a whole did not pronounce on that. And then the third point I would want to make is that Mr. Garre referred to cases and one IRS general counsel opinion that were issued during the period between 1958 and 2000 that applied Colony to the current statute, but they did so in a very specific way. That is, they relied on the aspects of Colony that talked about Congress's purpose to reserve the extended assessment period for cases in which the IRS was at a special disadvantage due to inadequate disclosure. And those cases applied that language in elucidating current subparagraph 2, which provides a safe harbor in cases of adequate disclosure. Respondent's position goes much further, though. Respondent is attempting to rely on Colony for the proposition that even if its disclosures were inadequate, the extended period still can't be applied to it. And none of the decisions on which Respondents rely establish that proposition. Roberts. Thank you. Roberts. Thank you, counsel. Counsel, the case is submitted.